AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone 13<br>DEA SSEE S001172964<br>("Target Device #1") | Case No. '23 MJ0513 AGS |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841(a)(1) | Possession of a Controlled Substance with Intent to Distribute |
| 21 USC Sec. 846 | Conspiracy |

The application is based on these facts:
See attached affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

EMANUEL ORTEGA *(Digitally signed by EMANUEL ORTEGA Date: 2023.02.14 16:33:08 -08'00')*
*Applicant's signature*

Emanuel Ortega, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: February 15, 2023

*Judge's signature*

City and state: San Diego, California      Hon. Andrew G. Schopler, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Emanuel Ortega, having been duly sworn, declare and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

>Apple iPhone 13
>DEA SSEE S001172964
>("Target Device #1")
>
>Black Apple iPhone
>DEA SSEE S000442603
>("Target Device #2")
>
>(collectively, the "Target Devices")

as further described in Attachments A-1 and A-2, and to seize evidence of crimes, specifically violations of 21 U.S.C. §§ 841(a)(1) and 846, as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Jorge Ivan OLIVERA ("Defendant" or "OLIVERA") in *United States v. Olivera*, 23-mj-423-MSB, for possessing a mixture and substance containing a detectable amount of cocaine with the intent to distribute said mixture and substance to another person. The Target Devices are currently in the custody of the Drug Enforcement Administration, and located at 4560 Viewridge Avenue, San Diego, California 92123.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

//
//
//

## BACKGROUND

3. I have been employed as a Special Agent since 2022. I am currently assigned to the San Diego Field Division ("SDFD"), Narcotic Task Force. I am a graduate of the Drug Enforcement Administration Academy in Quantico, Virginia.

4. During my tenure with DEA as a Special Agent, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry and those who possesses and distribute narcotics within and throughout the United States.

5. I am aware that it is common practice for drug traffickers to work in concert utilizing cellular telephones to maintain and store communications and related items with co-conspirators in order to further their criminal activities. A common tactic utilized by narcotics traffickers is to transport controlled substances within the United States by concealing the controlled substances in vehicles that travel within the United States. With respect to the transportation and distribution of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual(s) responsible for transporting and distributing the concealed narcotics within the United States. These communications can occur before, during, and after the narcotics are imported into the United States and transported therein. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with co-conspirators immediately prior to and following their illicit

transactions to negotiate prices and quantities, coordinate meeting times and locations, discuss the transportation through checkpoints, and then to discuss future transactions or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that conspiracies involving distribution of controlled substances generate many types of evidence including, but not limited to, cellular phone evidence such as voicemail messages referring to the arrangements of payment, names and contact information for co-conspirators, photographs, text messages, emails, messages from text messaging applications such as WhatsApp, social networking messages, and videos reflecting co-conspirators or illegal activity. I am also aware that cellular telephones (including their SIM card(s)) and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation, transportation, and distribution of narcotics may yield evidence:

    a.    tending to indicate efforts to possess with intent to distribute cocaine or other federally controlled substances;

    b.    tending to identify accounts, facilities, storage Device, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of or possession with the intent to distribute cocaine, or some other federally controlled substance, within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of or the possession with the intent to distribute cocaine, or some other federally controlled substance, within the United States;

3

    d.    tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute cocaine, or some other federally controlled substance, within the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

7. On February 8, 2023, an agent with the United States Border Patrol was performing the Agent's assigned duties in the primary inspection lanes at the San Clemente Border Patrol Station on Interstate 5 ("I-5"). The I-5 corridor is well known by law enforcement as a route to smuggle illicit contraband into the United States. Due to this, Border Patrol Agents conduct inspections along this corridor attempting to intercept narcotics, illegal aliens, as well as enforcing bulk cash smuggling laws as part of their daily duties.

8. At approximately 1:04 p.m., a United States Border Patrol Agent was performing his assigned duties in the primary inspection lanes of the San Clemente Border Patrol Checkpoint. The Agent observed a gold Honda Pilot (the "vehicle") approach primary lane two. The Agent motioned the vehicle to stop. The Agent noticed that the driver, later identified as OLIVERA, had his driver's license in his hand. The Agent asked OLIVERA where he was coming from. OLIVERA stated he was coming from Mexico. The Agent asked OLIVERA where he was going. OLIVERA replied he was traveling to Fillmore, California.

9. As the Agent was asking questions, he saw that OLIVERA kept inching his vehicle forward. The Agent felt that OLIVERA was trying to rush the conversation by slowly moving his vehicle past the Agent. Due to the Agent's training and experience, OLIVERA's actions were an indication of evasive behavior. The Agent told OLIVERA

4

to stop and asked for OLIVERA's driver's license. The Agent noticed that OLIVERA's hands were shaking as OLIVERA handed his driver's license to the Agent. Due to the aforementioned reasons, the Agent referred OLIVERA to the secondary inspection area for further investigation.

10.   At the secondary inspection, Agents with United States Border Patrol asked OLIVERA where he was going. OLIVERA replied he was headed to his house in Fillmore, California. Agents asked OLIVERA where he was coming from. OLIVERA replied from visiting his grandparents in Colima, Mexico. OLIVERA stated he was in Mexico for eight days. Agents asked OLIVERA if he had any luggage. OLIVERA pointed to a small black backpack located on the back seat of the vehicle. Agents asked OLIVERA how he was able to stay for eight days with just a small backpack with a few clothes. OLIVERA replied he had clothes at his grandparents' house. Agents asked OLIVERA if he was the owner of the vehicle. OLIVERA said he had just bought the vehicle from his friend. Agents asked OLIVERA for consent to search his vehicle. OLIVERA consented to the search.

11.   During the search, a K-9 Agent with United States Border Patrol asked OLIVERA if he could conduct a sniff of the interior and exterior of the vehicle using his canine partner. OLIVERA gave consent. The canine is trained to detect the odors of methamphetamine, cocaine, heroin, marijuana, and their derivatives, as well as concealed humans. While conducting an interior search, the canine went to the rear part of the vehicle and remained. While conducting an exterior search, the canine alerted to the rear hatch area of the vehicle. Additionally, the canine alerted to underneath the rear area of the vehicle.

12.   After the canine alert, the Agent inspected under the vehicle and noticed an aftermarket compartment built into the vehicle located above the rear axle. Agents placed the vehicle on a lift to access a panel to the compartment located above the vehicle's rear differential. The panel was held in place by two threaded nut bolts protruding from the lid. After removing the lid, Agents located 24 packages of bricks consistent with narcotics from the aftermarket compartment. The bricks presumptively tested positive for cocaine. The packages weighed a total of approximately 26.40 kilograms.

13. At approximately 1:55 p.m., Agents placed OLIVERA under arrest and charged him with violating Title 21, U.S.C., Section 841(a)(1), possession with intent to distribute cocaine.

14. The Target Devices were found and seized by United States Border Patrol Agents who were tasked to perform a secondary inspection of the vehicle and inventory all the property seized from OLIVERA and the vehicle. Target Device #1 was seized from OLIVERA's person at the time of arrest on February 8, 2023. Target Device #2 was discovered inside the vehicle during a final inventory and inspection of the vehicle on February 9, 2023. OLIVERA was the driver and sole occupant of the vehicle during the offense and had sole dominion and control of the items and property inside the vehicle, including the Target Devices, at the time of the offense.

15. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the Target Devices. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the Target Devices to communicate with others to further the distribution of illicit narcotics within the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug trafficking event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their trafficking activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Device for data beginning on January 8, 2023 up to and including February 9, 2023.

//

## METHODOLOGY

16. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the Target Devices and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

7

identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

19. Target Device #1 was previously downloaded. Following his arrest, Defendant was shown Target Device #1, identified it as his cell phone, and provided consent to search it. Law enforcement has not downloaded Target Device #2 to date. Law enforcement is seeking the instant warrants to obtain a full and comprehensive forensic download of both cellular devices.

## CONCLUSION

20. Based on all of the facts and information described above, my training and experience, and consultations with other law enforcement officers, I submit there is probable cause to believe that a search of the Target Devices will yield evidence of Defendant's violations of 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachments A-1 and A-2, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

EMANUEL ORTEGA
Digitally signed by EMANUEL ORTEGA
Date: 2023.02.15 09:22:10 -08'00'

Special Agent Emanuel Ortega
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 15th day of February, 2023.

HON. ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE

8

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Apple iPhone 13
>DEA SSEE S001172964
>("Target Device #1")

Target Device #1 is currently in the custody of the Drug Enforcement Administration and located at 4560 Viewridge Avenue, San Diego, CA 92123.

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Black Apple iPhone
>DEA SSEE S000442603
>("Target Device #2")

Target Device #2 is currently in the custody of the Drug Enforcement Administration and located at 4560 Viewridge Avenue, San Diego, CA 92123.

# ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Devices will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of January 8, 2023, up to and including February 9, 2023:

a. tending to indicate efforts to possess with the intent to distribute controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the distribution of or possession with the intent to distribute controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of or possession with intent to distribute of controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the distribution of or possession with the intent to distribute controlled substances within the United States, such as stash houses, load houses, or delivery points;

d. tending to identify the user of, or persons with control over or access to, the Target Devices; and

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846.